J. H. MAPES, Appellant, v. STEPHEN J. BURNS *et al.*, Defendant; HARRY SAXTON PIGGOTT, Interpleader, Respondent.

Kansas City Court of Appeals, December 6, 1897.

1. **Appellate Practice:** EFFECT OF OPINION: CONCURRENCE AND RESULT. Where in the decision of a case in the appellate court the other judges concur in the result, the written opinion is not controlling authority and can only be given that respect which is due to the writings of a learned and impartial lawyer.

2. **Fraudulent Conveyances:** EVIDENCE: PREFERENCES. Fraud must be proved by direct or circumstantial evidence and can not be found from mere conjecture; and a creditor, so long as he shall confine his efforts to the security of his whole debt, will be allowed a preference, even if it results in appropriating the entire assets of the insolvent debtor; and this case was rightly taken from the jury for the want of evidence.

3. ———: FRAUD OF DEBTOR: KNOWLEDGE OF PREFERRED CREDITOR. Knowledge that the debtor intends to hinder other creditors will not defeat a preferred creditor who does not participate therein.

4. ———: ATTACHMENT: WAIVER. When a vendor sues by attachment for the purchase price of the goods sold, he affirms the sale, though he may use the fraud to substantiate his attachment, but he can not use the fraud to impeach the sale on any ground which is not equally available to any other creditor.

5. ———: FICTITIOUS DEBT: OUTSTANDING DRAFTS. A defendant gave a bank a chattel mortgage to secure $48,000 in notes and an additional note of $9,000 to cover an $8,500 overdraft which left to his credit $469. Though such excess would ordinarily render the transaction fraudulent, yet, as in this case, where checks and drafts of the defendant were outstanding in excess of that amount, it can not have such an effect; and on the whole evidence in this case the debt secured was *bona fide* and legitimate.

*Appeal from the Clinton Circuit Court.*—HON. W. S. HERNDON, Judge.

AFFIRMED.

*Johnson, Rusk & Stringfellow, W. K. Amick,* and *F. M. Black* for appellant.

(1)   It is the duty of the trial court in passing upon a demurrer to the evidence to make every inference of fact in favor of the party offering the evidence, which the evidence warrants, and which the jury with any degree of propriety might make. *Wilson v. Board of Education,* 63 Mo. 137; *Noeninger v. Vogt,* 88 Mo. 589; *Rine v. R. R.,* 100 Mo. 228; *Buesching v. Gas Light Co.,* 73 Mo. 219.   (2) All cases of this character necessarily consist of two elements.   The fraud of the grantor and the grantees' participation therein, and evidence tending to prove either is admissible, although it has no bearing on the other. Bump on Fraud. Conv. [3 Ed.], p. 582; *Holmes v. Braidwood,* 82 Mo. 610, 614; approved in *Clark v. Cox,* 118 Mo. 652–655; *Desberger v. Harrington,* 28 Mo. App. 632; *Singer v. Goldenberg,* 17 Mo. App. 549; *Kurtz v. Miller,* 26 Kan. 314; *Meyberg v. Jacobs,* 40 Mo. App. 128–135; *Foster v. Hall,* 12 Pick. 357; *Hopkins v. Langton,* 30 Wis. 379.   (3) Collusion between the two may be inferred from even slight circumstances. *Rupe v. Alkire,* 77 Mo. 641–643; Bump on Fraud. Conv. [3 Ed.], p. 582; *Kelsey v. Murphy,* 26 Pa. St. 78; *Hartman v. Diller,* 62 Pa. St. 37; *State to use Salomon,* 112 Mo. 374; *Castle v. Bullard,* 23 How. (U. S.) 187.   In all this inquiry the widest latitude should be allowed. *Manheimer v. Harrington,* 20 Mo. App. 297, 301; *Erfort v. Consalus,* 47 Mo. 209; *Lincoln v. Claflin,* 7 Wall, 132–138.   The least degree of concert or collusion between the parties makes the acts of one the acts of all. *Sander v. Schechterly,* 91 Pa. St. 83; *McDowell v. Rissell,* 37 Pa. St. 164; *State v. Walker,* 98 Mo. 95.   (4) When these elements of fraud are made out the transfer will be vitiated, even

though the consideration paid or the debt secured should be valid. *Sexton v. Anderson*, 95 Mo. 379; *State ex rel. v. Purcell*, 131 Mo. 318, and cases cited. (5) On the other hand, if any part of the consideration is fraudulent, the deed will be vitiated. *Tube Works Co. v. Machine Co.*, 118 Mo. 376; *State ex rel. v. Hope*, 102 Mo. 410; *Boland v. Ross*, 120 Mo. 208; *Barton v. Sitlington*, 128 Mo. 164. (6) While an insolvent debtor may prefer one or more of his creditors, he can not delegate this authority to another. *Seger's Sons v. Thomas Bros.*, 107 Mo. 643; *Hamel v. England*, 57 Mo. App. 106; *Meyberg v. Jacobs*, 40 Mo. App. 129; *Scudder v. Payton*, 65 Mo. App. 315; *Selegson v. Brown*, 61 Tex. 182; *Peck v. Land*, 2 Ga. 1; *Menton v. Adams*, 49 Cal. 620; *Ferguson v. Hellman*, 55 Wis. 181; *Hamey v. Mix*, 24 Conn. 406.

*S. S. Brown, Vinton Pike* and *Willard P. Hall* for respondent.

(1) There was no evidence of any actual fraud on the part of the interpleader or his beneficiaries in the conveyance of the property involved in this case. There was no evidence in this case, as there was in the *Stokes* case, tending to show fraud on the part of Burns & Company in purchasing goods from plaintiff and the other attaching creditors, or any knowledge of, or participation in, said fraud by the bank or the Ayr Lawn Company. *Stokes v. Burns*, 132 Mo. 214. The decision of the supreme court in this regard is abundantly supported by reason and authority. Counsel for plaintiff in this case complain most of proposition 1 as stated above. But the correctness of that proposition, both on principle and authority, is certain. (2) If one fraudulently purchases goods from another, intending at the time not to pay for them, the fraudulent pur-

chaser's title to the goods is not void, but is valid until disaffirmed by the vendor. 1 Bigelow on Fraud, pp. 73, 74; *Lapp v. Ryan*, 23 Mo. App. 436-439; *Upton v. Englehart*, 3 Dill. 496-504; opinion by Judge DILLON. (3) Till rescission by the vendor, the purchaser may treat the property as his own in all respects. *Walker v. Collins*, 50 Fed. Rep. 742. (4) It is for these reasons that nearly, if not quite, all the authorities support the first proposition above stated. *Donald v. Constant*, 82 Ind. 212; *Goodall v. Stewart*, 3 S. Rep. 257; *Bach v. Tuch*, 26 N. E. Rep. 1019; *Gray v. St. John*, 35 Ill. 222; *Walker v. Collins*, 50 Fed. Rep. 737; *Millington v. Hill*, 47 Ark. 309; *Bank v. Frank*, 37 S. Rep. 400; *State to use v. Schulein*, 45 Mo. 521; opinion by BLISS, J. Dissenting opinion by Judge TAFT in *Treusch v. Ottenberg*, 54 Fed. Rep. 880. (5) There was nothing fraudulent in law in the facts shown by the evidence relating to the loan of $9,000 by the bank to Burns & Company on February 10, 1892. If the excess is paid for the purpose of being applied upon other honest indebtedness of the debtor, whether by the debtor himself or the preferred creditor, said excess will not vitiate the transaction. Bump on Fraud. Conv. 205, 207; *Baker v. Harvey*, 34 S. W. Rep. 853; *State v. Purcell*, 33 S. W. Rep. 13; *Saxton v. Anderson*, 95 Mo. 373; *Nichols v. Ellis*, 98 Mo. 344; *Dougherty v. Cooper*, 77 Mo. 528; *Singer v. Goldenberg*, 17 Mo. App. 549; *St. Louis Coffin Co. v. Rubelman*, 15 Mo. App. 287. Until the rights of third parties intervene, the preferred creditor can pay the excess to any creditor of the debtor and thereby purge the transaction of fraud on account of said excess. Bump on Fraud. Conv. 499; *Hutchins v. Sprague*, 17 Am. Dec. 439.

GILL, J.—This is a controversy over the title of a quantity of flour, feed, and other property, attached by

the plaintiff Mapes as the property of the defendant Burns, and interpleaded for by Piggott as trustee in a deed of trust executed by said Stephen J. Burns for the benefit and security of the National Bank of St. Joseph and Ayr Lawn Company. These two corporations may now as well be identified as that of the well known Burnes family of St. Joseph, and Calvin F. Burnes was at the dates hereinafter named the head and manager of both institutions. Defendant Burns is in no way related to the family just mentioned, and the names are differently spelled.

STATEMENT.

For more than ten years prior to February 10, 1892, the defendant, Stephen J. Burns, under the name of Burns & Company, had been engaged in the wholesale flour and feed business at St. Joseph, Missouri. He began in a small way, but from time to time enlarged his business, so that at the date this controversy arose, and his failure occurred, he might be considered an operator on a large scale. He seems to have purchased largely from numerous mills over the country, and had in storage at his failure something over $40,000 worth of flour. In addition to buying and selling flour at wholesale, he had also erected and was operating a mill for the manufacture of oat and corn meal.

During the entire course of his business, said Stephen J. Burns was a customer of the National Bank of St. Joseph, and at times borrowed large sums of money from the same as well as from the Burnes family corporation known as the Ayr Lawn Company. This indebtedness, according to the interpleader's showing, aggregated on February 10, 1892, about the sum of $57,000. With the exception of an overdraft of something over $8,500, this indebtedness was evidenced by nine promissory notes executed by said Stephen J. Burns and payable to said bank and Ayr Lawn Company. These notes grew out of loans made at different

times and renewed during the period from 1888 to 1892.

During the first part of February, 1892, Calvin F. Burnes, as the representative of the St. Joseph bank and Ayr Lawn Company, seems to have become uneasy as to Stephen Burns' condition and demanded of said Burns that he reduce his indebtedness to said corporations or give security therefor. This resulted in said Stephen Burns transferring certain warehouse receipts for flour stored at different places in St. Joseph, to the Ayr Lawn Company, and the further execution of a deed of trust covering flour, etc., on hand to the interpleader Piggott for the benefit of both the bank and said Ayr Lawn Company. Another deed of trust was also made covering the mill and machinery. These conveyances, together with the assignment of some accounts, had the effect in fact of pledging all the property belonging to said Stephen J. Burns for the security of the $57,000 he then owed to the Burnes corporations.

Immediately following this, the plaintiff in this action, together with several other millers throughout the country who had claims for flour sold to said Stephen J. Burns, brought various attachment suits and levied on the flour and other property which had theretofore been transferred for the security of the bank and Lawn Company. The latter corporations at once gave forthcoming bonds for the property and in due time by their trustee filed their interplea. To this the plaintiff in effect answered that the said transfers to the interpleader were fraudulent; that the claims of said bank and Lawn Company were in part, if not all, fictitious; that said conveyances in trust were made to hinder, delay, and defraud the plaintiff and other creditors, and that the beneficiaries therein had knowledge thereof and participated therein.

At the trial of these issues between the plaintiff and the interpleader, the court at the close of plaintiff's evidence directed a verdict for the latter, and from a judgment in accordance therewith plaintiff. has appealed.

This is one of a number of cases involving about the same state of facts. It seems that a few days after the deeds of trust made for the security of the St. Joseph bank and Lawn Company had been executed and the interpleader had taken possession of the property, not only this plaintiff, but sixteen other creditors of Stephen J. Burns, unprovided . for, attached, and the same issues were raised regarding the good faith and validity of said preferences. One of these (called the *Stokes* case) was tried, resulting, as this, in a peremptory instruction for the interpleader, and plaintiff appealed to the supreme court, where the judgment was affirmed (132 Mo. 214). But since in that case there was no opinion by the *court* as such, we have nothing from that source to aid us in the case at bar. Judge Robinson, it is true, in an opinion of some length, sets out the reasons that controlled his judgment in the matter; but no other judge seems to have agreed with him—at least the case as reported fails to show it. All the judges of the division (No. 1) concur in affirming the judgment—"concur in the result"—but we have no right to assume that any except Judge Robinson indorse the views of the opinion published. What was said then by the learned judge in that case (beyond the declaration that the judgment ought to be affirmed) we are not justified in treating as controlling authority. More than this, we are not in this record authoritatively advised as to the full extent of the evidence in the *Stokes* case, and must

*Margin note:* APPELLATE practice: effect of opinion: concurrence and result.

then even lose the benefit of a fair comparison of the two cases. In deciding the controversy in hand then, we can get no light from the *Stokes* case or from Judge Robinson's opinion, except that respect which is due to the writings of a learned and impartial lawyer.

As will be seen from the foregoing general statement, the plaintiff, in his controversy with the interpleader, assails the validity of the transaction whereby all the property of the common debtor was, on February 10, 1892, turned over for the security of the notes and overdraft held by the National Bank of St. Joseph and the Ayr Lawn Company. The question is, was there any evidence adduced at the trial tending to prove this to have been a transfer fraudulent within the meaning of our statute on fraudulent conveyances? The lower court held there was no such evidence; and from a careful inspection of the record, we are forced to the same conclusion.

EVIDENCE.

The particular charge is, that in the fall of 1891, and some three or four months before Burns' failure, Calvin F. Burnes and Stephen J. Burns, being satisfied of the latter's insolvency and failing condition, entered into a conspiracy to get into the hands of Stephen J. all the flour the latter could purchase on a credit; that said Stephen would never pay therefor, but the same should then be transferred to the bank and Lawn Company represented by said Calvin F. Burnes.

We find in the record no evidence to justify this charge of conspiracy to defraud creditors. The nearest approach to evidence tending in that direction is that during the few months preceding the execution of the deed of trust to the bank and Lawn Company, Stephen J. Burns did make large purchases of flour and did increase his stock much beyond that usually carried. He stated, however, as a reason for these large pur-

chases, that he thought it a favorable time to invest in flour and that he often bought largely at that particular season because flour was then low, and it paid to invest and hold for a later market. But whatever may have been the design of Stephen J. Burns, there is nothing whatever in the evidence tending to implicate the bank, the Lawn Company, or its officers.

Further attention is called to the fact that during these several months preceding Stephen J. Burns' failure, the bank and Lawn Company continued to loan and advance more money to said Burns, and it is reasoned therefrom that the purpose of said corporations was thereby to bolster up the credit of said Burns until he could secure large and additional amounts of flour, etc. It seems to us that this is a rather improbable and remote inference. It is true that from October 1, 1891, to the date of failure in February, 1892, these beneficiaries in the deeds of trust did continue to accommodate Stephen Burns with some $18,000 additional loans. But is it reasonable to infer therefrom that the bank's purpose in so doing was to strengthen the credit of a known insolvent debtor and allow him to impose on other creditors? Is it not more reasonable to suppose that the truth was, as all the direct evidence tended to prove, that Calvin F. Burnes, representing the bank and Lawn Company, had even then implicit confidence in the financial ability and business integrity of Stephen J. Burns, and that said Calvin believed, as he told some of these attaching creditors, that Stephen J. was good for his obligations. Said Calvin F., when called as a witness for the plaintiff, testified that at the time he thought Stephen J. solvent and a successful business man. And his conduct and indulgence shown in past transactions covering a series of years tended to support this measure of good opinion; for the evidence shows that Stephen J. had on

many other occasions during the four or five preceding years borrowed large sums of money from the Burnes bank, and on two occasions at least, the aggregate indebtedness had run up to about as it was just prior to the failure. These loans, too, were made to said Stephen J. without the requirement of any security.

Counsel for plaintiff say that it was absurd and therefore unreasonable that Calvin F. Burnes (whom they characterize as a shrewd financier) should have loaned Stephen J. so large an amount of money, and that, too, without any tangible security. But are we to pronounce the $57,000 claim a mere fiction because its creation seems to have been unbusinesslike or ill-advised? If this is a reasonable inference, then in like manner may it be inferred that these attaching creditors have not just or valid claims against the insolvent? As we now look back "through the hind sights" it is easy enough to see that Stephen J. Burns was not at any time entitled to the credit extended.

We are unable to discover in these various matters, and others alluded to in the record, anything from which the jury could reasonably infer that the debt secured was fictitious or dishonest, or that there was anything in the nature of a fraudulent scheme or conspiracy to defraud creditors entered into between said Stephen J. Burns and the bank, Lawn Company or its officers. Plaintiff's counsel speak truly when they say that in the investigation of the alleged fraudulent transactions of men they have the right to call attention to every significant circumstance; that fraud may be shown, not only by direct proof, but by circumstances, and that the jury may infer fraud, etc. But it must be still borne in mind that he who alleges fraud must prove it—either by direct and positive evidence, or by the establishment of such facts and cir-

FRAUDULENT conveyances: evidence: preferences.

cumstances from which fraud may be reasonably
inferred. Right acting is presumed; fraud must be
shown. The jury will not be allowed to find fraud
from mere conjecture or suspicion. And it seems to
us that this whole theory of a fraudulent conspiracy
charged against the beneficiaries personated by the
interpleader is based wholly on suspicion. In this
race between the creditors of Stephen J. Burns, the
law will recognize the speed of the swift, the active,
and diligent; and so long as he shall confine
his efforts to the payment or security of his honest
debt, the preferred creditor will be allowed to enjoy
the fruits of his effort, even if it results in appropri-
ating the entire assets of the insolvent debtor.

Interpleader's counsel have well urged, also, that
even if Stephen J. Burns intended a fraudulent pur-
chase of goods and the subsequent appropriation there-
of to the satisfaction of the claim repre-
——: fraud of sented by the interpleader, yet this would
debtor: knowl-
edge of pre- not impair the title of such interpleader
ferred creditor.
under the facts of this case. It has been
the recognized doctrine of Missouri courts since *Shel-
ley v. Boothe*, 73 Mo. 74, was decided, that "A creditor
has a perfect right to take security for an honest debt
from his debtor, although he may know that the debtor
thereby intends to hinder, delay or defeat his other
creditors, provided always the creditor so preferred
does not participate in the fraudulent purpose or
intent of his debtor." *Alberger v. White*, 117 Mo.
347, and cases cited. And in a case somewhat similar to
this it was said (we quote the syllabus): "Where the
creditor of a firm in failing circumstances made such
false representations to a third party as to induce him to
sell goods to the debtor upon credit, and the original
creditor afterward obtained these goods in payment
of a pre-existing debt, *held*, that although a clear case

of liability in a direct action thus arises against him, he is not therefore incapacitated to purchase the goods." *State to use of Steinberger v. Schulein*, 45 Mo. 521. On authority, then, of this case, it may be well contended that, even admitting that the managing officer of these preferred creditors may have fraudulently misrepresented the financial standing and solvency of Stephen J. Burns, and that creditors were thereby induced to sell goods, yet the preference might be upheld.

In this connection, also, a further question arises: Can this plaintiff, in this particular action, attack the validity of the sale of his flour to the debtor Stephen J. Burns? This is not a suit for the recovery of property fraudulently purchased, but it is an action for the recovery of the purchase price of that property. The plaintiff does not come into court complaining that said Burns made a purchase of flour intending not to pay therefor and asking a rescission of the contract of sale, but he occupies the attitude of affirming the sale and seeks to recover the price agreed to be paid. "A sale of goods which has been procured through fraud is not void *ab initio*, but is *voidable* only at the election of the vendor." *Lapp v. Ryan*, 23 Mo. App. 436, and authorities cited. See, also, 1 Bigelow on Fraud, 73. He had the right, if defrauded, to disaffirm the sale in a reasonable time and recover back the goods. The sale was not void till affirmed, but rather was valid until disaffirmed. *Upton v. Englehart*, 3 Dill. *loc. cit.* 504. Plaintiff, and vendors in like situation, "had their election to disaffirm such sales (if fraudulent) and invest themselves with the rights and entitle themselves to the remedies the law affords in such cases; or they might affirm the sales and have the rights and remedies of other creditors. The commencement of

*Margin note: ——: attachment: waiver.*

the attachment suits was at least a *prima facie* affirmance of the sales and waiver of the fraud, and all rights resulting from it. The appellant (plaintiff) now asserts his rights in affirmance of the sale, and while thus asserting them he can not insist upon rights which he would have had if he had disaffirmed the sale and was asserting rights resulting from such disaffirmance." This is quoted from a very learned opinion by Judge Beckwith in *Gray v. St. John*, 35 Ill. *loc. cit.* 239. And it would seem, in all reason, that it can make no difference in this form of action what fraudulent practices Stephen J. Burns may have adopted to secure plaintiff's flour, nor what may have been the knowledge of the interpleader or those he represents. This could be important only in a suit following a disaffirmance and rescission of the sale and to recover back the particular goods sold. As said in another case: "While a creditor of whom the debtor had bought goods, not intending to pay for them, but to use them in preferring other creditors, may doubtless dissaffirm the sale and recover his goods, unless re-sold to an innocent purchaser, yet, by bringing an attachment suit against his debtor, he affirms the sale and takes the place of an ordinary creditor, entitled to impeach the sale on no ground which was not equally available to any other creditor." *O'Donald v. Constant*, 82 Ind. 212.

These authorities draw additional force from the fact that in these cases the attachments were levied on the flour and other property formerly belonging to defendant Burns and without regard to whether such goods came from such attaching creditors or other parties. For aught that appears, it may be that the flour seized on the writ issued at the suit of this plaintiff may have all been purchased from other creditors not suing.

We think, then, Judge ROBINSON was correct in principle, when in the *Stokes* case (132 Mo. *loc. cit.* 224) he says: "The plaintiff, by suing upon his account, waived the fraud in the sale and treated it thereby as the property of defendant (Stephen J. Burns) with the same power of disposition in defendant over it as of any other property owned by him." But by this statement the learned judge did not mean that such fraudulent purchase could not be used as a *ground for attachment.* Plaintiff's counsel have, in the effort to show its unsoundness, carried the doctrine beyond the limit intended by Judge Robinson. Unquestionably, attachment will lie "where the debt sued for was fraudulently contracted," because the statute so provides. R. S. 1889, sec. 521. But the point is, that though such fraudulent purchase by the debtor may serve as grounds for attachment, yet when the writ goes out it may be levied on the property fraudulently purchased just as with other property belonging to the defendant in the suit, provided it has not in the meantime been disposed of by the fraudulent vendee. When the vendor sues for the purchase price, he waives the fraud to the extent only of conceding title in the fraudulent vendee, but the vendor does not waive the fraudulent act of the vendee in so far as it furnishes ground for attachment.

But as already said, even conceding that Stephen J. Burns had a fraudulent purpose in buying the flour, and intended at the time not to pay therefor, we think there were no facts or circumstance shown from which the jury might have legitimately inferred that the interpleader or those he represented were parties thereto.

In order to understand a further point made, it is necessary to state that when the failing debtor Burns

turned over his property for the security —: fictitious debt: outstanding of the bank and Lawn Company, the drafts. claims of the latter, as aleady stated, were evidenced by nine promissory notes theretofore executed and amounting to $48,000, and also an over-draft of more than $8,500. In liquidating this over-draft the debtor Burns at that time made an additional note for $9,000. Burns' account was credited with that amount, which not only paid the overdraft, but left $469.45 to his credit. This furnishes the basis for the contention that to the extent of this credit the deed of trust was made for the use and benefit of the com-mon debtor Stephen J. Burns.

If, now, there was any proof that this $469.45, or any considerable portion thereof, was paid over to the debtor, then the insistence of plaintiff's counsel would be of some avail—notwithstanding its insignificance when compared with the magnitude of the transaction. For the law is well settled that while the creditor may accept from the debtor sufficient of the latter's goods to satisfy his claim, yet in doing so he must not use the occasion to cover up and conceal other property that might be reached by the unpreferred creditors. And if he should do so, the entire transaction will be invali-dated. This would be a conveyance to the use of the grantor and void under the statute of fraudulent con-veyances.

But the weakness of this point is manifest from the consideration of other conceded facts and the utter absence of any evidence to prove that Stephen J. Burns received any part of this $469.45. The burden of so showing rested on the plaintiff. In his behalf the bank's officers were called as witnesses and the books introduced, and therefrom the proof was, that at the date of the transaction (February 10, 1892) there were outstanding against this account numerous checks, and

they were presented by and paid to other banks, through the clearing house; and besides, the debtor Burns had theretofore drawn on certain parties in California and Joplin exceeding $600; these drafts had been indorsed to the bank and credit taken therefor; they were then unpaid and chargeable back to said Burns. These were more than sufficient to and did exhaust said credit. And the testimony shows that this credit was intended and used for that purpose. We think there is no merit in this point.

As to the extent and genuineness of the debt which Stephen J. Burns owed the bank and Lawn Company, it would seem, ought not to be a matter of serious dispute. Plaintiff introduced the books of the bank and all the parties likely to be informed, and I undertake to say that they prove beyond all question the debt existed to the full limit named in the deeds of trust providing for the preference. The notes uncanceled and in the hands of these beneficiaries, the testimony of all the parties, the books used to record the various business transactions, all go to show this, and that, too, without any substantial contradiction. It is true that Stephen J. Burns, while on the stand, testified that he *thought perhaps* he at some time in January or February before the failure paid off some note of $4,000 or $6,000, but there is not a scintilla of evidence to support this *guess* or uncertain statement, and in his own evidence he unqualifiedly admits the full amount of the debt as claimed. The evidence in this respect is so overwhelming and conclusive that if the jury had found that any of the notes had been so paid, it would have been the plain duty of the court to set such verdict aside as unsupported by any substantial evidence. This being so, then the court was authorized in advance to treat such allegation as unproved, and instruct accordingly.

After a patient consideration of this large record and the very able and elaborate briefs and arguments of counsel, we feel bound to sustain the action of the trial judge in peremptorily instructing the jury to find for the interpleader. It discloses a case of legitimate preference obtained by *bona fide* creditors of a failing concern. Like a great many other seemingly prosperous enterprises, the wholesale milling and flour business of the defendant Burns was a great failure, and for years, doubtless, before the collapse, he was entirely unworthy the large credit extended by these various parties. These creditors who obtained the deeds of trust and assignment of the assets did not take an excessive preference, for the evidence is undisputed that there was not sufficient realized by nearly $13,000 to satisfy their legitimate demands. The judgment of the circuit court must be affirmed. All concur.